Good morning everyone. We'll hear one oral argument this morning. 21-9562 Estrada-Cardona v. Garland. Ms. Smith, are you ready to proceed? I am, Your Honor. Please go ahead. Good morning. My name is Jennifer Smith. I'm here on behalf of Petitioner Myra Estrada-Cardona. May it please the Court. The agency may not short-circuit the stop-time rule by invoking administrative deference in the face of an unambiguous statutory command. Just as the Ninth Circuit found in Cambrado-Cantor v. Garland, it cannot circumvent the statute to add a new way to end continuous physical presence because it failed to issue a statutorily compliant notice to a peer. Ms. Estrada filed the underlying motion to reconsider as soon as reasonably practical in her particular facts after the issuance of the BIA denial in this Court's decision in Benuelos-Galvis v. Barr. As a mother caring for her sick child, fighting her detention and removal, receiving medical care for herself, and trying to find a way to stay with her girls and raise them, six months hardly seems unreasonable in the exceptional circumstances in this case. There's a well-settled and strong presumption of judicial review of administrative action, and limitations on statutory motions are disfavored, especially where there's evidence that the basis for removal is now invalid. Mr. Lighthizer. Counsel, let me ask you this, because you're going into an argument that would assume that we agree with you and that the statute, as far as the, what do we call that, the rule, as far as I can remember. But where are you, because it looks to me like the board double-barreled you on this, on the issue that you're getting. So assuming that we agree with you as to the statute, how are you going to proceed, even though it's short? The board did say an exercise of discretion is still not going to win. So tell me how, walk me through how you're going to get around that, if we should send this back. Your Honor, if I understand your question correctly, you're asking how we can get around the exercise of discretion to not equitably toll or use its sua sponte authority here? Yeah, because that's the equitable tolling issue. And in addition, explain to me, is she out of country? She's already been deported, is that correct? She has been removed from the United States. Okay, so even then, under that order, she still can't come back in yet. But go ahead and explain to me the first part of my question, please. Okay, thank you, Your Honor. Unfortunately, the Board of Immigration Appeals did not provide us with sufficient information to understand why it wasn't going to exercise its equitable, agree with equitable tolling or exercise its sua sponte authority. Just as this court decided in Berdia v. Garland. Well, let me interrupt you there. I think it's pretty clear what they did. The BIA, I think, adequately explained that they found the change in the law was not sufficiently significant, and its impact was not unambiguous. I didn't have any trouble figuring out what the basis of the ruling was. Well, I think that, unfortunately, the BIA precedent would contradict them if you look at matter of... Well, that's a different argument. That's an argument that you disagree with them. It's not an argument that they didn't adequately explain. Well, we do also suggest that they do not adequately explain. I mean, in the sentence in the BIA decision, it simply says it's failing, it doesn't find equitable tolling. They give us no reason for that other than the faulty legal premise described above that, and we have no idea how much that infected its decision on equitable tolling or sua sponte authority. Back to Judge Baldock's question, your client's been deported, and if you want a plain language reading of this statute, the plain language is that you have to have been there for 10 years immediately preceding the date of an application. You can't file an application from within the United States because you're not in the United States. Doesn't that mean you can't possibly prevail even if you were to remand? Well, the applicant, if the case is reopened, then the applicant would have the opportunity to present her case on the merits, and she did have 10 years of continuous physical presence before she was removed from the United States. But she'd have to file a new application, wouldn't she? Well, that is definitely something we will be briefing if the case is remanded, but it is our position that she would stand in the place that she was before the erroneous decision came down. And that would be an equitable argument, right? Yes. How can she be entitled to equity when, for 12 years after agreeing to leave the country voluntarily, she has refused to leave the country voluntarily? She would not have had 10 years if she had done what she agreed to do. Because the law allows her to seek post-decision options, and she's been trying to get her day in court ever since 2010. Her first attorney didn't even show up in immigration court, so she's been trying to find a way to present her case, and this is a significant change in the law. Let me interrupt again. You say that she has been trying to challenge it, but can you point me to anything that says that once you agree to voluntary departure, you have a right to stay in the United States and challenge it, rather than departing as agreed and challenging it from afar? Yeah, there is no post-departure bar in this situation, as this court has decided in Contreras-Bonsenegra and also in Gonzalez-Alacron v. Macias, both by this court, simply because she's outside the U.S. does not prevent her ability from seeking judicial review of mistakes in her case. My point is, but for the fact that she failed to comply with her agreement to voluntary departure, she would not have 10 years. Well, but she's allowed to appeal, and she's allowed to file motions to reopen, which she did. She's allowed to appeal from Mexico. She's not allowed to thumb her nose at her agreement to voluntarily depart. Yes, actually, she's not thumbing her nose at her agreement to voluntarily depart, and I would remind this court that the only reason she agreed to voluntarily depart was because her attorney didn't appear in court to help her decide what she could do in her situation. So even if you look at a statute, for example, like when is an order of removal final? That statute itself agrees that there are opportunities that her final administrative order isn't final if she appeals her case. And instead, if she appeals or files a motion, it converts to an order of removal. And for since 2000, I believe it was 2013 until 2020, she was under an order of supervision given by the agency itself. The Department of Homeland Security and ICE allowed her to remain in the United States under an order of supervision. She checked in with them regularly and complied with all the terms of those requests. So the agency itself allowed her to remain in the United States. Well, may I jump in here again? That's what concerns me as to what I'm thinking is the equitable tolling argument. You were entitled and you did put on in the record below your argument in regards to that. So that's why I'm saying if assuming that we send it back and say, you know, we need more information as to the record that he has before them at that point in time. Your client doesn't get back, get to come back into the country to attend that hearing because they've got the record. All we're telling them to do is give us more information as to why the second point still doesn't allow us to affirm the board. Well, that's correct. I mean, what we're requesting is a remand with instructions upon remand. The BIA could review the record and decide that equitable tolling is still not appropriate or that an exercise of its response authority is still not appropriate. However, we still need the board to give us the information because it could be the opposite. It could be that upon review of the record and the factual circumstance of this case, the board could view it differently. If it does that, then it then it would reopen her case and she would have the opportunity to return to the United States. If the case is reopened, the government must bring her back. And here, Mrs. Strada has been exercising due diligence ever since 2010 as best that she can in her circumstances. And the decision in Herrera and the subsequent decisions in Benuelos and Ms. Chavez are significant changes of the law, just as the board found in matter of XGW. Council, I hate to interrupt you again because you're going at it very well. But again, that brings me back to what Judge McHugh was saying, that on the basis of the record that we have before us and what the board did, if we find that on the basis of that record, how do you get around it if we don't have any trouble understanding what the board did? In other words, denying her request in this matter. I mean, if you deny her request for remand, then, you know, it's all right. She'd have to decide whether to appeal further or not. OK, thank you. I'll try not to interrupt again. I really appreciate your questions. So, as I was mentioning, Mrs. Strada has been diligently trying to pursue her options for a day in court. And the equities in this case are pretty significant, starting with the failure of her attorney to appear in court and the lengthy appeal process there, plus the agency's own permission for Mrs. Strada to remain in the United States from 2013 until it suddenly decided it didn't want her in the United States without any change of circumstances or anything else, knowing about the change in law. Let me interrupt you about the attorney. I'm hoping I'm not getting it confused with a different case. But wasn't the conclusion that the attorney was hired to represent her husband and that the retention agreement specifically excluded this hearing? I think that that is, since I wasn't part of the record before, but I do think that there was some confusion there about what that attorney's role was for Mrs. Strada. And I think that part of that problem is that we have, as you know, very vulnerable clients who do not speak the language and are struggling to figure out how to get the help that they need in court and how to pursue that without any kind of training. So, you know, she's certainly been consistent with trying to file anything that she can as soon as there's an opportunity available to her. And ever since the Pereira decision came down, she's been trying to assert her eligibility for cancellation of removal. I mean, she couldn't have asserted that any sooner. So, in addition, even if equitable tolling isn't appropriate here, an exercise of the court's sua sponte authority would be appropriate in light of, as I mentioned, the extraordinary intervention of the change in law. She clearly acquired eligibility for relief by virtue of this particular change in the law. And the BIA has found that that is sufficient reason alone to exercise its sua sponte authority in the past. And again, this is all assuming that you agree with us that the final administrative order policy does not apply here. You know, which we agree. We agree that the statute is pretty straightforward and we do not need to look outside of the statute for anything where the statute speaks directly to the issue. The problem here, of course, is that that decision by the BIA to rely on matter of Garcia and address that policy at length infects the entire decision. So, we don't know whether its decision not to exercise equitable tolling or its sua sponte authority relied on that faulty legal premise. And also, as you as this court found in birdie of an untimely motion is not a sufficient reason to deny. If possible, I'd like to reserve my remaining time for rebuttal. Thank you, counsel. Mr McManus, you may proceed. You're still muted. I apologize, your honor. I thought the court was going to take care of that for me. Good morning, your honor. Thank you. And may it please the court. Keith McManus on behalf of the respondent. Your honor, this case, it seems to me that the outsized controversy caused by the stop time rule and the decisions in Pereira and Chavez is actually not dispositive here. And actually, the court can avoid wading into that morass if it relies on the alternative and dispositive reasons that the board gave for denying the motion in this case, which Judge Baldock has been suggesting is based on timeliness. An absence of equitable tolling and the board's discretionary determination not to exercise its sua sponte authority. I'm glad you went there, counsel, because I wanted to be sure and come back to this and correct me if I'm because I've looked at this matter in your briefing. The only thing that you seem to be responding to is to the stop time rule. You don't respond to the equitable tolling on those issues as I can see. So are you conceding that that's because I can't find it anywhere else. Now, direct me to where you responded to that second issue. Sir, your honor, I agree that the government's brief spends its time directly responding to the stop time arguments. The footnote 7 at page 21 seems to be the extent to which we explicitly respond to and address the arguments made in petitioners opening brief about equitable tolling and sua sponte reopening. But so certainly we have not waived those issues, your honor. But more importantly, they exist on the face of the board decision, and the court is reviewing the board's decision for an abuse of discretion. And whether the government did an adequate job of briefing that issue does not excuse the fact that the board very clearly articulated the reasons for its denial. And the reasons, again, clear from the face of the record are one, that the motion was years late and that there was no exceptional circumstances that warranted equitable tolling or exceptional circumstances that warranted sua sponte reopening. My understanding, counsel, is that you give a whole new meaning to articulately arguing a point in regards to those briefs. You would think that it's not unusual to get double barreled by a court or board, and that's what happened in this instance. So she's arguing completely, understandably, as to equitable tolling. You're arguing statute, and that seems to be your only argument except for, quote, a footnote. Now, I'll cross that bridge when I have to in regards to that. But let me take you to the statute first. And looking at that statute, as far, I don't see any ambiguity in my reading of the statute, because there's an A and a B. And if you look at that statute, and I've got to get it here in front of me. Okay. That's many notes here. Yeah. Look at the very last part of that section, which it says of this title, whichever is earliest. Now that means there can only be two bases. If you recall, call your ninth grade English diagram sentences and things like this. There's only two bases named in the statute, and then it identifies that there can only be whichever is the earliest so it can't be the. What are we calling that the final administrative. The final order. I mean that's just, and I don't see. I'm not one that's that much in favor of applying Chevron ever anyway but so Chevron doesn't apply to this. Now, correct me if you can. I mean that's, I've shared with you, from my concern so jump on me. Appreciate it. I don't intend to jump on you. I will try and respond as best I can. And I think the easiest way to do that your honor is to clarify the framework for which the agency applied this, we call it yes, a final order rule it's really a practice and it's only practice. It has nothing to do with application of the stop time rule because the government is acknowledging that in a case like this, in light of Pereira and Chavez, the stop time rule under the statute, the only provision that you speak of unexplained language was not invoked, it could not be invoked, because the NTA was statutorily deficient. We and the board, frankly, is not invoking the stop time rule as a basis for denying a cancellation application in this case. What it is saying is in unique circumstances of cases like this, where an alien has filed a belated motion to reopen, and who otherwise was not statutorily eligible because she had not approved the continuous physical presence at the time the agency ruled, in this case way back in 2010. They're saying that the continuing application rule, that's really where this stems from the idea that a cancellation application was continuing and that prior to a rear up prior to the implementation of the stop time rule, an applicant could continue to accrue presence through the duration or pendency of her proceedings. That now has been cut off completely by the stop time rule itself. But what happens, Your Honor, in a case like this, when the stop time rule cannot possibly be used? Congress could not have possibly contemplated a circumstance outside the statute where a deficient NTA, for more than 20 years, DHS would engage in this practice of filing deficient NTAs. And so what the board is doing and saying this practice or rule can coexist with the stop time rule in cases like this, where the stop time rule is an impossibility. And so this is not, it's not even a Chevron question per se, because it's not about interpreting the statute. It's looking outside of the statute to see whether as a matter of policy, it makes good sense for the agency to continue to say your presence must end when your proceedings end. I'm having trouble. I'm having trouble with that argument. Policy argument is very good. The question is what the law requires. And if you have 10 years of continuous presence and meet the other requirements, then you can seek this relief. And the statute says the two occasions when your 10-year continuous presence ends. And it just names those two. Those didn't occur here. So there's no basis for stopping the 10 years of continuous presence. I don't, I don't, when you say that the rule doesn't come into the stop time rule doesn't come into effect. I think you need to step back and look what's what ends the 10 years of continuous presence of the petitioner. And the only thing that stops it is in the statute. That's true, Your Honor. And let me add to that, though, to further explain my point. The Congress created the stop time rule, not as any sort of benefit to the alien. It was, in fact, to cut off this longstanding problem and loophole that whereby applicants for old suspension had been accruing presence during the pendency of their removal proceedings. And so you're right, Your Honor, that Congress identified only two instances in which continuous physical presence going forward will now be cut off. But think about what the practical implications of that means. The one and the only one we're talking about is at the commencement of removal proceedings when an NTA is issued. And every removal proceeding that has happened since 1996 began with the issuance of an NTA. It is only in the 20 years since that the Supreme Court has decided, well, you've been doing it wrong the whole time. And that doesn't mean that the reasons behind the stop time rule are not the same. The purpose was to cut off applicants at their knees. When your proceedings begin, your continuous physical presence ends. But the only reason that hasn't happened in this case was because of a procedural default by DHS. And so all the board is saying is we're going to go back in time and say it makes good policy sense. When there was something that Congress could not possibly have intended, which was defunct and deficient NTAs being issued continuously to invoke the stop time rule. They're saying we're not going to allow aliens to benefit from that. That does make great sense, but it also makes great sense to say if the original NTA was defective and then you give the person the proper notice, then the stop time rule applies. And the Supreme Court said no, that's not what the statute says. I think that's a pretty strong message to lower courts that the fact that a policy, a procedure makes a lot of sense doesn't override the strict language of the statute. I mean, I think it's just as good a policy rule to have said, if you give notice later on, then that's enough. And then the stop time rule applies and the Supreme Court cut that off. They didn't consider what the policy was. They said, we look at the language of the statute. Now you're coming up with another very good policy reason. Seems very unfair. It's very unfair, but it seems unfair in the decision by the Supreme Court. And the Supreme Court's telling us that's Congress's job. That's not the court's job to figure out what's fair. I suppose that's fair. That's a fair point. I think it's a really fair point. That's the reason why. Let's assume for purposes right now with what time you've got left, that we are going to say, this is an assumption. We're going to say that your position on that statute is wrong. Then how is there, what's left for the petitioner? And I want to hear why then what I call the double barrel issue, the second one. Why that still allows her to proceed if we even say the person's wrong. Thank you, Your Honor. I believe it doesn't. I believe one of the barrels is sufficient. And so take away what seems again to be the most outsized argument. And again, I think it's important to look at the face of the board's decision. And I do think if words matter so much, they certainly matter in this case. The board says very clearly at the threshold, the motion to reopen is untimely and not entitled to equitable toll. It also says there are no exceptional circumstances to warrant response a reopening. The board then says this. It says even if the motion were timely, petitioner is not prima facie eligible and then continues down the final order rule. Our point, Your Honor, and again, with my apologies, notwithstanding the government's failure to do a better job of beefing up this argument. It nevertheless is clear from the face of the board's decision, the reasons that it denied this belated motion. And frankly, the prima facie determination is an alternative. It said even if the motion was timely, you're still not prima facie eligible. You can excise that entire discussion from the board's decision and still have a defensible and sustainable board order. And that is because the board very clearly stated no exceptional circumstance. That is one of the two, only two factors to consider inequitable tolling. And they also said no exceptional circumstances for response a reopening to allow petition to apply for cancellation. As I understand this misargument, it's that we need to remand for the BIA to reconsider those grounds because it misinterpreted the statute. And so the question is whether the misinterpretation of the statute infected those other grounds for denying relief. And what's your response to that? I assume my time is going to run out. May I continue to answer your question, even if it does? OK, thank you. So there's two things about that, Your Honor. One, there's there's no indication at all that the prima facie eligibility in the final order rule had anything to do with equitable tolling. And that is because the board's order, as terse and as short as it is, is commensurate with petitioner's arguments. Petitioner's argument was only that the change in law was somehow an extraordinary circumstance that stood in her way. And the board is simply saying, nope, that is not the type of thing that warrants equitable tolling. So, again, even assuming for the sake of argument that she's correct about the prima facie argument and the final order rule, the board just found no, none of that had prevented her from filing earlier. And that is a dispositive reason for finding no equitable tolling. The board doesn't explicitly go into diligence either. But again, Your Honor, she claims that she's continued to pursue cancellation for years and years. There is a five year gap between the 2013 board order and the 2018 first motionary open where, sure, DHS was exercising its prosecutorial discretion to grant stays. But petitioner did nothing to pursue any challenge to her removal order and simply sat on her rights. That is not the kind of case that warrants equitable tolling. With regard to whether the final order. Your time's up, so be as brief as you can. I apologize, Your Honor. All I'm going to say is with regard to sua sponte, again, it's not clear. The board separated its analyses from timeliness and sua sponte denial. And it said there is no exceptional circumstances. The board was not required to do or say more. And this court's jurisdiction is limited in that context. And so it can only find legal error there. If, in fact, the analysis infected the sua sponte denial, which we don't think it did. Thank you. Judge Hart, can I indulge? Please, please. Do you agree with Miss Smith that the petitioner didn't have any obligation to actually leave the country once she agreed to voluntarily remove herself? Once she filed her motion to reopen, Your Honor, the failure to voluntarily depart was eliminated. The penalties for failing to part were eliminated. That is by operation of the regulation. But it was only because she did file that initial motion to reopen, which, again, had nothing to do with cancellation. But, nevertheless, she is right about the DD issue. Thank you. Thank you. Any other questions from the panel? Thank you, Mr. McManus. How much time does Miss Smith have left? 46 seconds? Take that two and a half minutes to compensate for the extra time we gave Mr. McManus. So you have two and a half minutes, Miss Smith. Thank you, Your Honor. Two and a half. Yeah. Okay. Let's get the clock right. Okay. Now, please proceed. So in response to the arguments by the agency, we would note that the BIA did abuse its discretion here because it did not sufficiently state its reasoning for not exercising its sua sponte authority. The only mention in the entire decision is one sentence in which it says, finally, we declined to exercise our discretionary sua sponte authority to reopen these proceedings. It does not say why. It does not give any information that it is. What is your authority to say for the proposition that they have to explain that? My authority for that would be Berdia v. Garland, a decision by this court, 13 F. 4th, 1125, decided in November of 2021. As to equitable tolling, they say we find no extraordinary circumstance. However, looking at extraordinary circumstances does require a fact-specific approach of some kind. It does have to look at what we presented in the record and indicate why that was not sufficient. So both of these things we think are required for the BIA to do upon remand. The other point I wanted to make is that as far as the policy decision, the policy arguments raised by the agency about how it would like a backstop to the statute when it fails to serve a statutorily compliant notice to appear, I would note that the agency could have reissued a notice to appear at any time for Ms. Estrada if that was a real concern. You don't have to take the whole time if you don't need it. What about removal? I mean, you've got a decision that says you have to be removed. I mean, at some point, there has to be a way to stop the accumulation of the 10-year period because that's the whole reason that Congress amended the statute in the first place is because people were intentionally delaying so that they could get 10 years in. Sure. You say the answer is to reissue the notice to appear. Well, that's one possible solution the government could have. I mean, it's in their power to stop the time. That's the whole reason Aira Aira was created, the stop time rule, was because the government wanted the power to stop the time with the issuance of the NTA. And other than reissuing a notice to appear, how can the government stop the time? I guess they can actually deport someone. It could remove her. Sure. That would be another way. Anything else they could do? Let's see. Well, no, nothing that the government could do. Let me ask, what would the NTA say? Well, the NTA would just be statutorily compliant in that it would, you know, they have the power to replace her in proceedings if they wanted to. Proceedings to do what? What would the NTA say? You have to appear or we're going to enforce what we've already ordered? Sure. Sure. That's a proper NTA? Wouldn't you challenge that NTA? I mean, but I mean, I do think that that's an option they have at any time. Once Pereira was issued, they could have, you know, they could have made the decision to reissue NTAs with dates and times. For dates and times that have already passed. Well, but they can always set a new court hearing if they'd like. So start over. Sure. Okay. Thank you, Counsel. Thank you, Your Honors. Case is submitted.